UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

TIM SOLEK,
    Plaintiff,

v.                                                       Case No. 3:23-CV-311 (OAW)

JOSEPH PAGNONI, et al.,
    Defendants.

## INITIAL REVIEW ORDER

Self-represented plaintiff Tim Solek has filed a complaint naming fourteen defendants, RN Joseph Pagnoni, Counselor Supervisor Santana, LCSW Milna Rosario, Counselor Sardinas, Dr. Francesco Lupis, Correctional Officer Loos, Correctional Officer Hall, Lieutenant Musa, Captain Angelakopoulos, APRN Akina Richards, Captain Bishop, Grievance Coordinator Bennett, Deputy Warden Damien Doran, and Warden David Daughty.  He alleges that they were deliberately indifferent to his serious medical needs, and he seeks damages and injunctive relief from Defendants in their individual capacities.

The Prison Litigation Reform Act requires that federal courts review complaints brought by prisoners seeking relief against a government entity or officer or employee of a government entity.  28 U.S.C. § 1915A(a).  Upon review, the court must dismiss the complaint (or any portion thereof) if it is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.  See 28 U.S.C. §§ 1915(e)(2)(b), 1915A(b).

The court has thoroughly reviewed all factual allegations in the complaint and has

1

conducted an initial review of the allegations therein, pursuant to 28 U.S.C. § 1915A. Based on this initial review, the court orders as follows.

I.      **FACTUAL BACKGROUND**

While the court does not set forth all the facts alleged in the 363 paragraphs of Plaintiff's complaint, it summarizes his basic factual allegations here to give context to its ruling below.

While incarcerated at Corrigan Correctional Center, Plaintiff was diagnosed with an umbilical hernia, vertigo, neuropathic pain in his legs, tinnitus, and fourth toe arthralgia. He was issued bottom bunk and bottom tier passes that were effective through May 2021.

In July 2020, Plaintiff was transferred to MacDougall Correctional Institution ("MacDougall"). Upon arrival, Plaintiff informed the intake officer about his passes, and was instructed to inform the nurse doing his medical intake, who would notify the admitting and processing room ("A & P"), to ensure Plaintiff an appropriate cell.

Plaintiff's medical intake occurred four hours later, at 11:45 p.m., because of a facility lockdown. Plaintiff told Nurse Pagnoni that he had bottom bunk and bottom tier passes but that A & P had assigned him to a top bunk on the top tier. Nurse Pagnoni told Plaintiff that these passes did not follow inmates on transfer and that he had to be re-evaluated by medical staff. Plaintiff explained his diagnoses and asked Nurse Pagnoni to review his medical file, but Nurse Pagnoni refused, stating that it was midnight and that he had four additional inmates to process. Nurse Pagnoni did state on Plaintiff's medical intake report that he had active bottom bunk and bottom tier passes.

Plaintiff "got himself put" on suicide watch in an attempt at avoiding discipline for refusing housing.  On July 20, 2020, Plaintiff explained the issue with his passes to a social worker and a psychologist.  Later that day, he was removed from suicide watch and assigned by A & P to O-pod, cell 45, an upper tier cell with only the top bunk available.

Medical staff said they would contact his unit manager about his passes but advised him to write to sick call/prompt care until this occurred.  Plaintiff was seen at sick call a few days later.  The nurse confirmed that he had active bottom bunk and bottom tier passes and said she would contact Plaintiff's unit manager, Counselor Supervisor Santana, to have him moved to a bottom bunk on the bottom tier.

Plaintiff spoke to Counselor Supervisor Santana two days later.  Counselor Supervisor Santana told Plaintiff that he had already informed the nurse that there were no open cells and that he could not move Plaintiff.  Counselor Supervisor Santana said that O-pod was an intake unit, and that Plaintiff should be moving in about two or three months.  He advised Plaintiff not to worry about his passes.

Plaintiff was still assigned to the top bunk on the top tier on September 23, 2020.  The following day, he reminded Counselor Supervisor Santana to inform officials that he required a bottom bunk on the bottom tier.  Counselor Santana told Plaintiff they had already discussed the matter and advised him to speak with mental health staff.

On September 28, 2020, and October 1, 2020, Plaintiff wrote to Counselor Supervisor Santana, again reminding him of his needs when he was moved to a different housing unit. Counselor Supervisor Santana told Plaintiff that A & P handled cell moves and that he had no control over them.  He advised Plaintiff to write to the medical or

3

mental health unit for assistance with housing arrangements. On October 28, 2020, Plaintiff spoke to LCSW Rosario about his passes and his need for a bottom bunk on the bottom tier when being relocated to a different housing unit.

On November 9, 2020, Plaintiff was moved to cell I2-78, a cell on the top tier with only the top bunk available. Neither Counselor Supervisor Santana nor LCSW Rosario had arranged for Plaintiff to be housed in a bottom bunk on the bottom tier. When he learned of the assignment, Plaintiff told Control Officer Calafiore that he had bottom tier and bottom bunk passes.

Officer Calafiore contacted medical to confirm the passes and called A & P to have Plaintiff reassigned to the bottom tier. A & P stated there were no available bottom tier cells and advised Plaintiff to write to his unit manager or counselor to have the matter corrected. Officer Calafiore then contacted Lieutenant Musa who stated that the problem was one for the unit manager to fix, and not him. Lieutenant Musa stated that spending one night in the top bunk on the top tier would not harm Plaintiff, and that the alternative was segregation. Plaintiff accepted the assignment, in order to avoid segregation.

Plaintiff wrote to Counselor Sardinas and to Unit Manager Bishop for relief. On November 11, 2020, Counselor Sardinas told Plaintiff that there were no open cells on the bottom tier and that he was not going to separate cellmates just to accommodate Plaintiff. He advised Plaintiff to remain in cell I2-78 until a cell became available. The following day, Captain Bishop repeated what Counselor Sardinas had said. They told Plaintiff that he could not move to the bottom tier because everyone on the bottom tier had bottom tier passes.

On Monday, November 14, 2020, between 1:30 a.m. and 2:00 a.m., Plaintiff "blacked out" while watching television and fell off the top bunk. He suffered an acute non-displaced fracture of the left fibula. Plaintiff's cellmate immediately called the block officer and told her that Plaintiff had fallen, was in severe pain, and needed medical help.

A short time later, the block officer said she had called the medical unit, but no one answered. She said she would keep trying. About 3:30 a.m., the block officer told Plaintiff that medical staff said they were busy preparing for the 5:00 a.m. diabetes and medication distributions. Nurse Ring told the officer that someone would come to the block to check Plaintiff after the distributions were completed.

In severe pain and unable to put weight on his leg, Plaintiff remained sitting on the floor by the door and fell asleep until breakfast. At 6:30 a.m., when breakfast was completed, medical staff still had not come to see Plaintiff. Two inmates helped Plaintiff downstairs to the dayroom where he sat at a table. Plaintiff told the officer that he was in severe pain, his leg was swollen, and he could not put weight on it. Plaintiff said that he would not return to his cell until he was seen by medical staff. The officer called the medical unit.

Around 6:45 a.m., Nurse Michaud and APRN Heap came to the unit with a wheelchair and took Plaintiff to the medical unit. At about 7:10 a.m., Dr. Lupis examined Plaintiff's leg. Dr. Lupis ordered the leg iced and splinted and directed that Plaintiff be taken to the hospital by prison van.

A nurse informed Lieutenant Musa that Plaintiff was being sent to the hospital on Dr. Lupis's order. After Plaintiff's leg was iced and splinted, he was taken to A & P by

5

wheelchair under the supervision of Lieutenant Musa. Upon his arrival, Plaintiff was taken to the back room where he was strip searched and given an orange jumpsuit. The search was performed by Officers Loos and Hall under the supervision of Lieutenant Musa. The officers had removed the splint to conduct the search and to enable Plaintiff to put on the jumpsuit. Reports of the incident omitted the fact that Plaintiff was wearing a splint when he arrived at A & P.

Lieutenant Musa did not contact the medical unit to determine whether the splint could be removed. The splint also would have prevented application of leg irons and a tether chain, the standard trip restraints. Medical staff had informed Lieutenant Musa and Officers Loos and Hall that the splint had been applied to hold Plaintiff's leg in place and to prevent further injury. Removal of the splint and application of the leg irons caused Plaintiff unnecessary pain. Prison directives permit use of different restraints for inmates with casts or braces, but these different restraints were not used for Plaintiff.

Ongoing construction at the facility required that Plaintiff use a different door than normally was used in order to access the van. Lieutenant Musa did not have Plaintiff taken to the van by wheelchair. Instead, he required Plaintiff to walk about 20-30 yards with shackles and a broken leg. Once at the van, the clumsiness of Officers Loos and Hall caused Plaintiff to fall to the floor, twisting his leg.

Hospital X-rays confirmed the fracture. A splint/cast was applied, crutches were recommended, and an order was entered for no weightbearing until Plaintiff was seen by an orthopedist on Friday. Upon his return to MacDougall, Dr. Lupis admitted Plaintiff to the infirmary. On Friday, November 20, 2020, Plaintiff's splint/cast was removed, and he

was returned to general population.

APRN Richards examined Plaintiff on December 1, 2020. Plaintiff stated that he still lacked full mobility and that he experienced pain when walking. He requested a cane. APRN Richards authorized a cane for 10-12 weeks with weekly equipment checks. However, later that day, she ordered Plaintiff to return the cane to the medical unit. Plaintiff was required to walk on his injured leg, causing him to experience severe pain.

Captain Angelakopoulos reviewed the incident report and determined that Lieutenant Musa acted professionally and according to all policies and procedures. Plaintiff alleges that, if Captain Angelakopoulos had read the report, he would have seen that Lieutenant Musa removed the splint without medical authorization, used leg irons instead of flex cuffs, and required Plaintiff to walk on his broken leg instead of calling for a wheelchair.

Upon his return to I2-Block, Plaintiff filed a grievance against staff members responsible for his fractured leg and for making him walk on the fractured leg. Under prison rules, the grievance coordinator would have retrieved the grievance from the unit grievance box. Plaintiff never received a receipt for or a response to the grievance. After thirty business days, Plaintiff filed a grievance appeal. He did not receive a receipt or response.

About two weeks later, Plaintiff was hospitalized for an acute case of COVID-19. Between January 4, 2021, and May 16, 2021,[1] Plaintiff was in and out of the hospital. He

---

[1] Plaintiff also states he was hospitalized between December 2020 and April 2021.

was treated for COVID-19 symptoms, COVID-19-related infections, blood clots, kidney stones, renal failure, and sepsis.  About a year later, he began drafting this complaint.

On January 10, 2022, Plaintiff wrote to Grievance Coordinator Bennett blaming her for not wanting to process his grievance.  On January 13, 2022, she denied doing so and stated she never received the grievance.  On October 22, 2022, Plaintiff then filed a grievance claiming Grievance Coordinator Bennett did not process his grievance two years earlier and requesting permission to refile the grievance.  Warden Daughty rejected the grievance because it concerned matters from two years earlier and, thus, was not filed within thirty days of being discovered.

On June 28, 2022, Plaintiff wrote to Dr. Lupis questioning his decision to send Plaintiff to the hospital in the prison van rather than in an ambulance.  He did not receive a response addressing his question.

On October 14, 2022, and November 8, 2022, Plaintiff wrote to Deputy Warden Doran because (according to Plaintiff) he had signed off on the incident report package without reading it.  Deputy Warden Doran indicated that if Plaintiff had had an issue with the manner in which the incident report was addressed, then he should have challenged it two years previously.

## II.  **DISCUSSION**

Plaintiff contends that Defendants were deliberately indifferent to his serious medical needs.  He also alleges that defendants Bennett and Daughty interfered with his ability to exhaust his administrative remedies.

### A. Deliberate Indifference to Serious Medical Needs

To state a cognizable claim for deliberate indifference to serious medical needs, Plaintiff must allege facts showing that his medical need was "sufficiently serious." *See Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A "sufficiently serious" deprivation can exist if the plaintiff suffers from an urgent medical condition that can cause death, degeneration, or extreme or chronic pain. *See Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). A medical condition may not initially be serious, but may become serious because it is degenerative and, if left untreated or neglected for a long period of time, will "result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000). "In determining whether a medical need is sufficiently serious to be cognizable as a basis for a constitutional claim for deprivation of medical care, we consider factors such as whether a reasonable doctor or patient would find the injury important and worthy of treatment, whether the medical condition significantly affects an individual's daily activities, and whether the illness or injury inflicts chronic and substantial pain." *Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019) (citing *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). In many cases, the actual medical consequences flowing from the denial of care are "highly relevant" in determining whether the denial of care subjected the inmate to a significant risk of serious harm. *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003)).

Plaintiff suffered a fractured fibula when he fell from the top bunk. He alleges that

9

the fracture caused severe pain, affected his daily activities, and required treatment at the hospital.  Thus, for purposes of initial review, the court will assume that Plaintiff had a serious medical need.  See *Morales v. Connecticut Dep't of Corr.*, No. 3:22-cv-01179(KAD), 2022 WL 16635388, at *4 (D. Conn. Nov. 2, 2022) (assuming for initial pleading purposes that a broken leg is a serious medical need).

Plaintiff also lists several diagnoses and alleges that he was issued bottom bunk and bottom tier passes to address these medical conditions.  For purposes of initial review only, the court will assume that, because such medical conditions caused his medical providers to issue the passes, those medical conditions themselves can be classified as serious medical needs.

Plaintiff also must show that the defendants were deliberately indifferent to his serious medical needs.  "The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." *Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013).  The defendants must "appreciate the risk to which a prisoner was subjected," and have a "subjective awareness of the harmfulness associated with those conditions." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017); see also *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) ("Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate ham will result." (quotation marks omitted)).  Thus, "mere negligence" is insufficient to state a claim for deliberate indifference. *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).

10

### 1. Dr. Lupis

Plaintiff alleges that Dr. Lupis examined him within fifteen minutes of his arrival in the medical unit, determined that he required a hospital visit, and ordered that the leg be iced and splinted in order to protect it from further damage during transport. The only deficiency Plaintiff identifies in Dr. Lupis's treatment is the fact that he ordered Plaintiff to be transported in a prison van rather than in an ambulance.

Issues of medical judgment "cannot be the basis of a deliberate indifference claim" absent evidence of deliberate indifference. *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011). Dr. Lupis's decision regarding transportation was a medical judgment as to the urgency (or lack thereof) for Plaintiff to reach the hospital or, it was, at most, negligence; neither supports an Eighth Amendment deliberate indifference claim. Therefore, the claim against Dr. Lupis is dismissed.

### 2. APRN Richards

APRN Richards authorized a cane for Plaintiff's use but withdrew the authorization on that same day. Plaintiff alleges no reason for her actions. Crediting Plaintiff's allegations that APRN Richards determined that a cane was medically required, the court cannot determine on the current record whether APRN Richards's withdrawal of authorization was based on medical judgment or some other reason. Accordingly, the claim will proceed against her for further development of the record.

### 3. Defendants Musa, Loos, and Hall

Plaintiff contends that Lieutenant Musa and Officers Loos and Hall were deliberately indifferent to his medical needs when they removed the splint, applied leg

irons, and required him to walk to the transport van without obtaining medical authorization for any of these actions. Non-medical prison staff may be liable under the Eighth Amendment by "denying or delaying [the inmate's] access to medical care or by intentionally interfering with his treatment." *Samuels v. Fischer*, 168 F. Supp. 3d 625, 648 (S.D.N.Y. 2016) (citation and internal quotation marks omitted).

In *Samuels*, correctional officials took custody of an inmate from prison officials who had determined that the inmate needed outside medical care, and they permitted him to languish in a prison van for hours before transporting him for such care. *Id.* at 649. The court determined that these allegations were sufficient to state a claim for deliberate indifference to medical needs. *Id.* at 649-51.

Here, Plaintiff alleges that he was taken to A & P by wheelchair with his leg splinted by medical staff, and that it was intended that he be transported to the hospital for treatment of his fractured leg. Defendants Musa, Loos, and Hall removed the splint, applied leg irons, and required Plaintiff to walk on the fractured leg in leg irons. They did not obtain medical approval for any of these actions. While Plaintiff does not allege that Defendants Musa, Loos, and Hall prevented him from accessing medical care altogether, the court concludes that Plaintiff has plausibly alleged that such defendants intentionally interfered with his medical treatment. The claim against these defendants will proceed.

### 4. Delay in Initial Treatment

Plaintiff also includes a claim for the delay in providing initial treatment for his broken leg. He was not seen by medical staff for five hours after his fall, and even then, he was seen only because he refused to return to his cell otherwise. However, Plaintiff

does not allege that any defendant was responsible for the delay, and he alleges no facts suggesting that either Dr. Lupis or APRN Richards was aware that he had fallen. Thus, this claim is dismissed.

Even if Plaintiff had identified a proper defendant, the claim would be dismissed. The courts distinguish claims for denial of treatment from those for delay in treatment. *See Benjamin v. Pillai*, 794 F. App'x 8, 11 (2d Cir. 2019). Although a delay in medical care can demonstrate deliberate indifference to a prisoner's medical needs, a prisoner's Eighth Amendment rights are violated only where the defendant "knowingly or intentionally" delayed medical treatment. *See Jimenez v. Sommer*, No. 14-cv-5166(NSR), 2017 WL 3268859, at *8 (S.D.N.Y. July 28, 2017) (citation omitted). "[T]he Second Circuit has reserved those instances to cases when prison officials deliberately delayed care as a form of punishment, ignored a life-threatening and fast-degenerating condition for three days or delayed major surgery for over two years[.]" *Id*. (citation and internal quotation marks omitted). Plaintiff alleges that correctional staff were told that the medical staff was busy preparing for medication distribution. Thus, care was not delayed as a form of punishment. In addition, although painful, Plaintiff's injury was not a life-threatening and fast-degenerating condition.

### 5. **Defendants Pagnoni, Santana, Sardinas, Rosario, Musa, and Bishop**

Plaintiff alleges that Defendants Nurse Pagnoni, LCSW Rosario, Counselor Supervisor Santana, Counselor Sardinas, Lieutenant Musa, and Captain Bishop all failed to honor his bottom tier and bottom bunk passes, and to ensure that he was assigned to a bottom bunk on the bottom tier. Failure to honor a temporary bottom bunk pass has

been deemed sufficient to state a plausible Eighth Amendment claim for deliberate indifference to serious medical needs. *See Patterson v. Quiros*, No. 3:19-cv-147(MPS), 2019 WL 2603079, at *9 (D. Conn. June 24, 2019). Accordingly, the deliberate indifference claims for failure to honor the passes will proceed against Defendants Pagnoni, Santana, Sardinas, Rosario, Musa, and Bishop.

### B. Captain Angelakopoulos and Deputy Warden Doran

Plaintiff alleges that Captain Angelakopoulos and Deputy Warden Doran did not read the entire incident report before approving it. This allegation constitutes, at most, negligence, which is not cognizable under section 1983. *See Moore v. Chapdelaine*, No. 3:15-CV-775(VAB), 2015 WL 4425799, at *3 (D. Conn. July 17, 2015); *see also Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) ("[T]o state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice."). The claims against Captain Angelakopoulos and Deputy Warden Doran are dismissed.

### C. Interference with Attempts to Exhaust Administrative Remedies

Plaintiff contends that Grievance Coordinator Bennett and Warden Daughty interfered with his attempts to exhaust his administrative remedies on the claims asserted in this action.

An inmate has no constitutional right to an administrative remedy program, to have an administrative remedy properly processed or investigated, or to receive a response to an administrative remedy he filed. *See Crispin v. Sussel*, No. 3:21-CV-885(KAD), 2023 WL 22421, at *5 (D. Conn. Jan. 3, 2023). The United States Court of Appeals for the

14

Second Circuit has stated that due process claims relating to prison grievance procedures "confuse[] a state-created procedural entitlement with a constitutional right" and that "neither state policies nor 'state statutes ... create federally protected due process entitlements to specific state-mandated procedures.'" *Riddick v. Semple*, 731 F. App'x 11, 13 (2d Cir. 2018) (quoting *Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003)).

As Plaintiff has no federally protected right to grievance procedures, his claims are dismissed pursuant to 28 U.S.C. § 1915A(b)(1). Plaintiff may assert his arguments that administrative remedies were not available to him, should the defendants first assert as an affirmative defense that Plaintiff failed to exhaust his administrative remedies.

## **ORDERS**

All claims against Defendants Lupis, Angelakopoulos, Bennett, Doran, and Doughty are dismissed pursuant to 28 U.S.C. ¶ 1915A(b). The case will proceed on the claims for deliberate indifference to serious medical needs against Defendants Richards, Musa, Loos, Hall, Pagnoni, Santana, Sardinas, Rosario, and Bishop.

Accordingly, Plaintiff has two options as to how to proceed following issuance of this Initial Review Order:

(1) If Plaintiff wishes to proceed immediately on the claims against Defendants Richards, Musa, Loos, Hall, Pagnoni, Santana, Sardinas, Rosario, and Bishop, and only as set forth above, he may do so without further delay. If Plaintiff selects this option, he shall file a notice on the docket **within thirty days** from the date of this order informing the court that he elects to proceed with service as to the claims

against Defendants Richards, Musa, Loos, Hall, Pagnoni, Santana, Sardinas, Rosario, and Bishop.  The court will then begin the effort to serve process on these defendants.

(2)  Alternatively, if Plaintiff wishes to attempt to replead any of the claims asserted in his complaint that have been dismissed (in order to attempt to state a viable claim), he may file an amended complaint **within thirty days** from the date of this order.  An amended complaint, if filed, will completely replace the original complaint, and in evaluating any amended complaint, the court will not consider any allegations made in the original complaint.  Any amended complaint that is filed will be reviewed by the court to determine whether it may proceed to service of process on any defendants named therein.  If Plaintiff elects to file an amended complaint, the original complaint addressed by this Initial Review Order will not proceed to service of process on any defendant.

If the court receives no response from Plaintiff **within thirty days** from the date of this order, the court will presume that Plaintiff wishes to proceed on the original complaint as to the claims permitted by this initial review order to go forward, and Plaintiff will have to show good cause if he later seeks to amend the complaint in any manner in the future.

**Change of Address**.  If Plaintiff changes his address at any time during the litigation of this case, Local Rule 83.1(c)(2) provides that he **MUST** notify the court.  **Failure to do so can result in the dismissal of the case.**  Plaintiff must give notice of a new address even if he is incarcerated.  Plaintiff should write PLEASE NOTE MY NEW ADDRESS on the notice.  It is not enough to just put the new address on a letter without

indicating that it is a new address.  If Plaintiff has more than one pending case, he should indicate all the case numbers in the notification of change of address.  Plaintiff should also notify Defendants or counsel for Defendants of his new address.

**IT IS SO ORDERED**  at Hartford, Connecticut, this 25th day of January, 2024.

/s/
Omar A. Williams
United States District Judge